UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Elliott Holly (aka Sarprio B. Doranti), | Court File No. 04-CV-1489 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Deborah Konieska and Mike Smith, | |
| Defendants. | |

## I.     INTRODUCTION

The evidence shows that, between February 26, 2004 and April 14, 2004, Defendants unlawfully punished Elliott Holly by subjecting him to 46 days in extreme isolation, sending him to jail for 2 days, and denying him food, clean clothing, and hygiene for 8 days. Defendants did so without conducting a hearing, and later continued the punishment against the recommendations of the Hospital Review Board. Defendants used the behaviors for which MSOP is obligated to provide treatment to Holly—*i.e.*, the behaviors which justify Holly's commitment and which are related to his mental illnesses—as an excuse for their actions. Defendants informed Holly their intent was to rid MSOP of black patients by sending them to prison. The Defendants violated MSOP's policies, Minnesota law, and the United States Constitution. Because MSOP's records and Defendants' testimony support the Plaintiff's claims, the Defendants' Motion for Summary Judgment must be denied.

## II.    FACTS

### A.     Relevant Parties

#### 1.     MSOP

The Minnesota Sex Offender Program ("MSOP") operates a secure facility in Moose Lake, Minnesota to provide "care and treatment" to persons civilly committed as sexual

psychopathic personalities ("SPPs") and sexually dangerous persons ("SDPs"). Minn. Stat. § 246B.02. Patients are civilly committed to MSOP to receive "treatment, in the interest of humanity and for the protection of the public," not to receive punishment. *State ex rel. Pearson v. Probate Court*, 287 N.W. 297, 300 (1939), *aff'd*, 309 U.S. 270 (1940); *Allen v. Illinois*, 478 U.S. 364, 373 (1986) (discussing commitment of sexually dangerous persons for "psychiatric care and treatment"); (Affidavit of Michael Wilhelm (hereinafter "Aff. M.W."), Exs. A at 14 & B at 18). Only 2 of over 500 patients in the history of MSOP have successfully been released, one of which re-offended and returned. (Aff. M.W., Ex. A at 17 & 25).

    2.    Elliott Holly

    Elliott Holly was civilly committed to the Minnesota Sex Offender Program ("MSOP") in 1991 as a SPP. *Holly v. Gomez*, 1996 WL 146730, *1 (Minn. App. 1996); *see* Minn. Stat. § 253B.02, Subd. 18b (defining SPP). Holly has been diagnosed as suffering from: antisocial personality disorder ("APD");[1] borderline intellectual functioning;[2] paraphilia;[3] and polysubstance abuse. Aff. M.W., Exs. D & E at DHS 1732, 1738, & 1743.

---

[1]     APD is "a pervasive pattern of disregard for, and violation of, the rights of others…" (Aff. M.W., Ex. C at 701). "Individuals with [APD] fail to conform to social norms with respect to lawful behavior… repeatedly perform acts that are ground for arrest… disregard the wishes, rights, or feelings of others… tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault…" (*Id.* at 702). "Individuals with [APD] also often have personality features that meet criteria for other Personality Disorders, particularly Borderline, Histrionic, and Narcissistic Personality Disorders." (*Id.* at 703).

[2]     Borderline intellectual functioning means "an IQ in the 71-84 range," which is slightly above the range for mental retardation (an IQ of 70 or below). (Aff. M.W., Ex. C at 740).

[3]     Paraphilia is characterized by "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors…" (Aff. M.W., Ex. C at 566).

Holly regularly engages in "verbally abusive, hostile, and sexually inappropriate behavior." *In re Holly*, 1994 WL 396314, *1 (Minn. App. 1994); (Aff. M.W., Ex. A at 49-50). Holly threatens suicide "often," sometimes more than once a month. (Aff. M.W., Ex. A at 55). Holly's "nonsexual assaultive behavior or social delinquency behavior"—which includes "threatening to kill or injure staff and residents"—has been cited as justification for his continued commitment at MSOP. *In re Holly*, 1994 WL 396314 at *3; *Holly v. Gomez*, 1996 WL 146730, *3 (Minn. App. 1996).

Prior to February 26, 2004, MSOP provided treatment to Holly for anger management and developed behavior programs specifically tailored to his threatening and dangerous behaviors. (Aff. M.W., Ex. A at 54 & 114-15; Ex. F at DHS 1807-08 & 1810 (identifying Konieska as responsible for Holly's treatment); Ex. G at DHS 1622 (noting Holly's behavior programs "address[] assaults + other dangerous behavior + escalating behavior.")).

### 3.   Deborah Konieska

Deborah Konieska is part of the clinical staff at MSOP. (Aff. M.W., Ex. A at 10-11). In 2004, Konieska was Holly's Behavioral Analyst ("BA") and a member of his treatment team or "op-team." (*Id.*; Affidavit of Elliott Holly (hereinafter "Holly Aff."), ¶ 18).

As a BA, Konieska specializes in treating behavioral problems by developing individual treatment plans for patients, facilitating group therapy meetings, and providing psycho-educational programming for anger and stress management. (Aff. M.W., Ex. A at 11); [Docket 134, ¶ 4]. She develops, implements, and oversees individual behavior programs to manage and correct problem behaviors. (Aff. M.W., Ex. A at 11-12); [Docket 134, ¶ 4].

Despite being his BA and a member of his treatment team, Konieska claims she was

unaware that Holly was a SPP or otherwise mentally ill.[4]  (Aff. M.W., Ex. A at 53).  Konieska claims that a patient's status as a SPP is not relevant to her job.  (*Id.* at 54).

        4.    <u>Mike Smith</u>

In 2004, Mike Smith worked as a Special Investigator at MSOP.  (Aff. M.W., Ex. B at 8; Docket 136, ¶ 7).  Smith was not an employee of MSOP or the Department of Human Services ("DHS"), but was instead an employee of the Department of Corrections ("DOC").  (Aff. M.W., Ex. H at 5); [Docket 136, ¶ 7].

Smith's duties included conducting investigations, determining "whether... the complaint/referral merits further investigation," and if sufficient evidence of a crime existed, forwarding the results to law enforcement.  (Aff. M.W., Exs. B. at 11-12 & I at DHS 1506).  To investigate matters, Smith interviewed patients and staff and reviewed reports, disciplinary histories, and medical records.  (Aff. M.W., Ex. B at 14-15).  Clinical staff were required to inform Smith if the patient under investigation was mentally ill.  (*Id.* at 15).

If Smith determined sufficient evidence of a crime existed, he would submit a report to the Moose Lake Police Department ("MLPD"), who would forward it to the Carlton County Attorney's Office.  (*Id.* at 67).  Of the 82 cases that Smith investigated at MSOP, he referred only 18 (approximately 22%) for prosecution because he determined the other 78% were not supported by sufficient evidence.  (*Id.* at 66-67).

    **B.**    <u>**Conditions at MSOP**</u>

        1.    <u>The Living Unit</u>

When not in isolation, patients at MSOP reside on the "living unit" and receive treatment.

---

[4]      Holly's commitment at MSOP would be unconstitutional absent mental illness. *Hince v. O'Keefe*, 632 N.W.2d 577, 581-83 (Minn. 2001) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).

(Holly Aff., ¶ 7). The living unit includes a common area, where patients freely move about, socialize, and eat meals together. (Holly Aff., ¶ 7; Aff. M.W., Ex. A at 28; Affidavit of Wayne Clements (hereinafter "Clements Aff."), ¶ 4). During the day, the door to a patient's room may be locked only if the patient does not feel safe. (Aff. M.W., Exs. A at 27 & J at DHS 1977). Even then, the door may only be locked for 4 hours, unless approved by an RN. (Aff. M.W., Ex. J at DHS 1977). The Patients' Bill of Rights states that patients have a right to be "free from physical restraint and isolation, except in an emergency, or when a doctor orders them." (Aff. M.W., Ex. Y at DHS 1987).

Patients on the living unit participate in group therapy and engage in recreational activities, like watching TV and using computers. (Holly Aff., ¶ 7). A recreation room is available where patients shoot pool and play ping pong, cards, or video games. (Holly Aff., ¶ 7; Clements Aff., ¶ 4; Affidavit of Julian Caprice (hereinafter "Caprice Aff."), ¶ 14). Patients go outside for at least 1-2 hours per day. (Holly Aff., ¶ 7; Aff. M.W., Ex. A at 28). Patients play basketball, handball, lift weights, and exercise in a gymnasium. (Holly Aff., ¶ 7; Konieska at 28; Clements Aff., ¶ 4; Caprice Aff., ¶ 14). Patients also take classes, such as ceramics and keyboarding. (Holly Aff., ¶ 7; Clements Aff., ¶ 4).

2.    Patient Behavior and Treatment

Many patients at MSOP have significant behavioral problems. (Aff. M.W., Ex. A at 20-21; Holly Aff., ¶ 52; Caprice Aff., ¶¶ 7-10; Affidavit of Guy Giishig (hereinafter "Giishig Aff."), ¶ 10). Patients frequently expose themselves, masturbate in front of staff, and threaten other patients and staff. (Holly. Aff., ¶ 52; Aff. M.W., Exs. A at 196-97 & B at 179). Patients with "personality disorders with borderline personality traits," are known to have "extreme difficulty" with "emotional regulation." (Aff. M.W., Ex. A at 21).

MSOP is obligated to work with patients towards the goal of "release from the institution,

not just a single problem..." *In the Matter of Smith*, 392 N.W.2d 582, 585 (Minn. App. 1986). "Self-regulation"—*i.e.*, "learning how to deal adequately with... normal life stressors"—is a regular component of the "sex offender specific treatment" provided at MSOP. (Aff. M.W., Ex. A at 19). For example, MSOP uses "anger log" assignments to help patients with "self-regulation or anger management and stress management." (*Id.* at 22-23). Anger management is also discussed during therapy. (Caprice Aff., ¶ 10).

### 3.   Patient Discipline

MSOP is required to specify behavioral rules for patients. Minn. R. § 9515.3080, Subp. 2. The rules must be provided to each patient and must identify consequences for violations. *Id.* Whenever a patient will experience "any consequence whatsoever" for his behavior, an op-team meeting must be held. (Aff. M.W., Exs. A at 37 & J at DHS 1968). The op-team may impose Level A, Level B, or Designated Area Restrictions ("DAR") as disciplinary consequences— these restrictions allow a patient to remain on the living unit, but limit his participation in specified activities and/or his ability to enter certain areas for a period of time. (Aff. M.W., Ex. J at DHS 1972-74). If no less restrictive alternative exists, the op-team may place a patient in isolation. (Aff. M.W., Ex. K at DHS 1380, 1382).

### C.   Isolation

#### 1.   Protective Isolation

##### a.   *Purpose and Physical Conditions of Isolation*

MSOP uses Protective Isolation ("PI") to contain dangerous patient behavior. [Docket No. 132, ¶ 10]. PI is solitary confinement in an 8' x 12' room in the Northwest PI Unit (a "PI Cell"). (Holly Aff., ¶ 8; Aff. M.W., Ex. A at 58-59); Minn. R. § 9515.3090, Subp. 4. PI Cells have cement walls, a bed, a toilet, and a sink. (Holly Aff, ¶ 8). There is one small window, which cannot be opened. (*Id.*). There is a large steel door with a small viewing window, which

only staff can open. (*Id.*; Aff. M.W., Ex. L at DHS 1333).

Almost every aspect of a patient's life is controlled and monitored in isolation. (Holly Aff., ¶ 9). Patients take meals alone in their Cells. (*Id.*). Meals, papers, and pens are slid through a cuff port in the steel door. (*Id.*; Aff. M.W., Exs. A at 59 & L at DHS 1333). Patients are prohibited from communicating with one another and are reprimanded if caught communicating. (Holly Aff., ¶ 9). Opportunities for visitations are rare. (*Id.*). If allowed, patients must be restrained and observed during visitations. (Aff. M.W., Ex. L at DHS 1340). Contact visits are allowed only for clergy or attorneys. (*Id.* at DHS 1340-41).

### b.    *Breaks*

In isolation, patients are eligible for either "commons" breaks or "fresh air" breaks. (Holly Aff., ¶¶ 10 & 12). During a "commons break," a patient is let out into the PI Commons Room—a windowless 20' x 30' hallway surrounded by PI Cells—for a set amount of time (*e.g.*, 30 minutes a day), during which the patient may shower, brush his teeth, watch TV, or walk in circles. (*Id.*). A half-hour commons breaks does not afford patients much time to exercise after attending to their hygiene needs. (*Id.* at ¶ 12; Clements Aff., ¶¶ 6-7; Affidavit of Rob Scott (hereinafter "Scott Aff."), ¶ 3). During a "fresh air" break, a patient sits in a 5' x 8' room with a window that opens for 15 minutes. (Holly Aff., ¶ 12). If provided, commons and fresh air breaks are the only opportunities for exercise or hygiene in isolation. (*Id.*; Clements Aff., ¶¶ 6-7).

### c.    *Procedural Safeguards for PI*

Minnesota law and MSOP's policies include safeguards to prevent abuse of PI. PI may only be used "as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." Minn. R. § 9515.3090, Subp. 4. Treatment "designed to eliminate or reduce the specified behavior or behaviors that caused the need for [PI]" must be provided to the patient.

*Id.* The use of PI must be limited to the minimum necessary and may never be used for behaviors related to a psychiatric condition. (Aff. M.W., Ex. A at 63–64; Ex. L at DHS 1328; Ex. K at DHS 1380).

The decision to put a patient in PI must first be made by the patient's op-team,[5] then a PI Assessment Meeting[6] must occur. (Aff. M.W., Ex. K at DHS 1380 & 1382). Before PI may exceed 48 hours, a PI Review Panel Meeting[7] must occur, and the patient must receive criteria for release. (*Id.*; Aff. M.W., Ex. L at DHS 1341). The patient must be informed of the PI Review Panel Meeting and must be allowed to attend if in behavioral control. (Aff. M.W., Ex. L at DHS 1341). If PI exceeds 7 days, it must first be approved by the Clinical Director and the Hospital Review Board ("HRB").[8] (Aff. M.W., Ex. K at DHS 1380, 1385-86).

The HRB must recommend, in writing, whether PI should be continued, terminated, or modified. (*Id.* at DHS 1387). If the HRB's recommendation is rejected or modified, the Clinical Director must explain why, in writing, within two business days. (*Id.*). PI may not exceed 30 days unless either: (1) the PI Assessment Team "conducts a thorough and comprehensive review of the [PI] and the patient's treatment needs, and prepares an updated PI statement;" or (2) the HRB approves continuation of PI. (*Id.* at DHS 1388).

---

[5]    "Op-team" is synonymous with "treatment team," and it consists of security and clinical staff, including BAs. (Aff. M.W., Ex. A at 30-31, 36-37).

[6]    The PI Assessment Team includes at least three staff members, one of which must be a Health Services Professional. (Aff. M.W., Ex. K at DHS 1380).

[7]    The PI Review Panel consists of at least three staff members "who were not participants in the decision to impose [PI]." (Aff. M.W., Ex. K at DHS 1381).

[8]    *See* Minn. Stat. § 253B.22.

2.    Administrative Isolation/Restriction

a.    *Purpose and Physical Conditions of AI*

In 2004, MSOP used Administrative Isolation ("AI") when "criminal behavior by a patient was suspected." [Docket 132, ¶ 10]. AI is the exact same as PI. (Aff. M.W., Ex. A at 78; Holly Aff., ¶ 5). When a patient is placed on AI, he is sent to "the [PI] unit," locked in a PI Cell, and observed the same as patients on PI. (Aff. M.W., Ex. A at 74 & 78; Holly Aff., ¶ 5).

b.    *Differences Between AI and PI*

AI differs from PI only in two procedural respects. First, unlike PI, patients in AI are not given any release criteria for return to the living unit. (Aff. M.W., Ex. A at 82-83; Holly Aff., ¶ 6; Scott Aff., ¶ 3). Second, there is no meeting for AI "in terms of the way [MSOP staff]… assess someone's behavior" prior to placing a patient in PI. (Aff. M.W., Ex. A at 76; Holly Aff., ¶ 6).

c.    *Minnesota Law Regarding AR*

Minnesota law does not address AI, but it does address "Administrative Restriction" ("AR"). AR is defined as "any measure utilized by the commissioner to maintain safety and security, protect possible evidence, and prevent the continuation of suspected criminal acts." Minn. Stat. § 253B.02, Subd. 24. "A patient has the right to be free from unnecessary or excessive [AR]," and may not be subject to "any further deprivation of privileges than is necessary." Minn. Stat. § 253B.03, Subd. 1a(a). Minnesota law states that AR "may include separate and secure housing," but it does not state that AR may include PI or other extreme deprivations.[9] *Id.* at Subd. 1a(b). A patient placed on AR because the patient is under criminal

---

[9]    In fact, Minnesota law states "[AR] does not mean [PI]." Minn. Stat. § 253B.02, Subd. 24.

investigation "must be released from [AR] when the investigation is completed." *Id.* at Subd. 1a(e). If the patient is charged, AR may continue until the charge is disposed of. *Id.*

### d. *MSOP Polices Regarding AI*

MSOP had no policies regarding the use of AI in 2004 apart from a brief memo that was circulated among staff, but withheld from patients. (Aff. M.W., Ex. A at 74 & 77; Ex. M at DHS 1940-41; Holly Aff., ¶ 32). Patients were not informed in advance of the circumstances under which they could be sent to AI. (Aff. M.W., Ex. A at 81; Holly Aff., ¶ 32).

MSOP's policies and procedures for PI were supposed to apply to AI in 2004. (Aff. M.W., Ex. A at 77, 139, 147; Ex. G at DHS 1588; Ex. M at 1940 ("This memorandum supplements existing policy regarding the use of [PI].")). However, Holly was told that MSOP's PI policies did not apply to him because he was on AI—not PI. (Aff. M.W., Ex. N at DHS 123-28, 541-42 & 587-88).

### 3. BAs Are Responsible for Isolation at MSOP

BAs are responsible for determining what restrictions are imposed on a patient to address behavioral problems. [Docket 134, ¶ 5]; (Clements Aff., ¶ 10). BAs are responsible for the documentation required when a patient is placed in PI or AI. (Aff. M.W., Ex. A at 11). BAs are responsible for determining what items patients are allowed to have in isolation. (*See* Aff. M.W., Ex. N at DHS 592 ("The items you are allowed to have are outlined in your [AI] program written by your BA.")). BAs are responsible for determining what recreational and exercise activities are available to patients in isolation. (*See* Aff. M.W., Ex. N at DHS 105 ("The [AI] program spells out access to exercise and recreation."); *see also id.* at DHS 564 & 572). BAs are responsible for the behavioral programs that determine when a patient is released from isolation as well as making changes to a patient's confinement in isolation. (*See* Aff. M.W., Ex. N at DHS 99 ("You may request to meet with your BA to discuss your behavioral program for release from

[PI]."); Aff. M.W., Ex. O at DHS 2015 (identifying Konieska as the "[BA]… responsible for authoring any changes to [a patient's AI].")).

BAs determine the frequency and length of the commons and fresh air breaks provided to patients in isolation. (Aff. M.W., Ex. P at DHS 1863 & 1869 (addendum authored by Konieska increasing Holly's break time in AI on April 1, 2004)). BAs determine when patients in isolation are able to meet with recreation staff to address their fitness and leisure needs. (*Id.* at DHS 1863). BAs determine whether patients in isolation may use the gymnasium. (*Id.* at DHS 1869). BAs can order that patients receive bag meals or no meals at all in isolation, or that a patient not be allowed to shower or exercise in isolation. (Holly Aff., ¶ 33).

### D.   Holly's Disciplinary History at MSOP

Until 2002, MSOP managed Holly's disruptive behaviors with administrative discipline. As a result, Holly has a "lengthy history of time spent in [PI]." (Aff. M.W., Ex. A at 48). Holly spent almost the entirety of 1999-2002 in PI, which is not unusual—other patients have spent as much or more time in PI. (*Id.* at 63; Holly Aff., ¶ 4).

Beginning in 2002, MSOP staff began pressing criminal charges against Holly and sending him to jail, without a trial, for his behaviors. (Holly Aff., ¶¶ 14-15). In September 2002, Holly was charged with terroristic threats and criminal damage to property. (*Id.* at ¶ 14). He was immediately transferred to Carlton County Jail, where he remained for 13 days without a trial. (*Id.*). On November 8, 2002, Holly was charged with assault—he was immediately transferred to Carlton County Jail, where he remained for 131 days without a trial. (*Id.* at ¶ 15).

Holly pled guilty to the terroristic threats charge from September 2002 in July of 2003, and in September 2003, he was sentenced to 21 months. (*Id.* at ¶ 14). Holly received credit for the 144 days he already spent in jail and was allowed to serve the remainder of his sentence on probation at MSOP under a 3-year stay of execution. (*Id.*; Aff. M.W., Ex. Q at 6-7).

### E.   Events Preceding Defendants' Unlawful Punishment of Holly

#### 1.   Horseplay on February 23, 2004

On February 23, 2004, an op-team meeting was held, and Holly and another patient named Jerome Linkey were disciplined for causing "unit disruption by horseplay." (Aff. M.W., Ex. R at DHS 1816). During the horseplay, Holly unintentionally poked Linkey in the head with a pen, and Linkey choked Holly and punched him in the face before staff intervened. (Holly Aff., ¶ 21). Both Holly and Linkey received 3 days of Level A restrictions as a result, which they could reduce to 1 day by writing one page about how horseplay is disruptive. (Aff. M.W., Ex. R at DHS 1817).

#### 2.   31 Hours in PI on February 24-25, 2004

On February 24, 2004, an op-team meeting was held after Holly threatened to throw a chair; the op-team put Holly in PI and required him to exhibit 31 hours of calm, controlled behavior for release. (Holly Aff., ¶ 22; Aff. M.W. Ex. R at DHS 1814-15). While in PI, MSOP staff removed all of Holly's property from his room without forewarning,[10] including Holly's clothing, personal effects, and family photos. (Holly Aff., ¶ 23). They also removed: (i) Holly's toilet paper; (ii) his window covering; (iii) correspondence from his defense attorney regarding his upcoming criminal trial; and (iv) transcripts and court documents related to his civil commitment challenges. (*Id.*; M.W., Ex. G at DHS 1617).

#### 3.   Holly's Suicidal Threats on February 25-26, 2004

When Holly returned to his room on the evening of February 25, 2004, he discovered his property had been removed. (Holly Aff., ¶ 23). Holly requested toilet paper and a window

---

[10]     Konieska did not write the behavioral program justifying removal of Holly's property until February 26, 2004, *after* she put Holly in AI. *See* [Docket 132, ¶ 9 & Ex. B].

covering, and staff informed him those items had been removed pursuant to a behavioral program written by a BA named Tony Kaufenberger. (*Id.* at ¶ 24); [Docket 137, Ex. A at DHS 1615]. In response, Holly threatened suicide and went into an angry rage. (*Id.* at ¶ 24); [Docket 137, Ex. A at DHS 1615]. Staff locked Holly's room and put him under constant observation. (*Id.* at ¶ 24); [Docket 137, Ex. A at DHS 1615]. Staff eventually gave Holly toilet paper, but continued to refuse him a window covering to block light entering his window. (Holly Aff., ¶¶ 23-24). Overnight, Holly threatened to throw hot soup and coffee on himself at breakfast the following morning. (*Id.* at ¶ 24). Holly also constructed a shank and threatened to kill himself. (*Id.*). Between approximately 7 and 9 a.m. on February 26, 2004, Holly wrote multiple grievances explaining that he was angry because of the removal of his property. (Aff. M.W., Ex. N at DHS 92-93, 872-77).

    4.   Smith's Investigation of Holly

        a.   *Preliminary Activities*

On February 25, 2004, MSOP Director, Jerry Zimmerman, asked Smith to investigate the Holly/Linkey incident on February 23, 2004. (Aff. M.W., Ex. B at 48-49). Zimmerman stated that Linkey regarded the incident as horseplay. (*Id.* at 49 & 64). Even though Smith does not regard horseplay as a crime, Smith complied with Zimmerman's request. (*Id.* at 86 & 114). That day, Smith asked Konieska to prepare a list of all of Holly's behavioral violations to send to Holly's probation officer. [Docket 132, ¶ 9 & Ex. C; Docket 133, ¶ 14]. Konieska prepared a list of everything Holly had done wrong since 1993 and gave it to Smith. [Docket 132, ¶ 9 & Ex. C].

        b.   *Smith's Meeting With Holly*

At 8:10 a.m. on February 26, 2004, Smith went to Holly's room. (Holly Aff., ¶ 26); [Docket 133, ¶ 7]. Smith asked for Holly's shank, and Holly gave it to him without resistance.

(*Id.*; Holly Aff., ¶ 26; Aff. M.W., Ex. B at 52-53). Smith asked if Holly would like to discuss his behavioral program. (Holly Aff., ¶ 26). Smith did not say that Holly was under investigation. (*Id.*; Aff. M.W., Ex. B at 51). Holly agreed to speak with Smith if he could call his attorney, and Smith agreed. (Holly Aff., ¶ 26). At 8:30 a.m., Holly signed a no-harm contract, and his suicide watch ended. [Docket 137, Ex. A. at DHS 1608].

At approximately 9 a.m., Smith met with Holly in the team room. [Docket 133, ¶ 8]. Throughout the meeting, Holly was "calm" and in control of his behavior, and Smith was not concerned about his safety. (Aff. M.W., Ex. B at 71-72, 92 & 98-99). At the beginning of the meeting, Smith stated that Holly could not call his attorney and that he was there to help MSOP staff send Holly to prison because they wanted "you blacks out of the facility." (Holly Aff., ¶ 27).

During the meeting, Holly explained that he was upset because of the removal of his property. (Aff. M.W., Ex. B. at 42, 90-95 & 109-10); [Docket 137, Ex. B. at 7-10]. Holly informed Smith that he had anger management problems and said he wanted to complete an anger log regarding his behavior the night before. (Aff. M.W., Ex. B at 94 & 99); [Docket 137, Ex. B. at 11]. Holly explained that he created the shank during the previous night to harm himself, not others. (Aff. M.W., Ex. B at 104-05); [Docket 137, Ex. B. at 15].

With respect to the Linkey incident, Holly explained that he and Linkey were engaged in horseplay. (Aff. M.W., Ex. B at 86); [Docket 137, Ex. B. at 3-4]. Holly explained that they were disciplined and later met and resolved their differences. (Aff. M.W., Ex. B at 86-88 & 125); [Docket 137, Ex. B. at 6, 26]. Holly stated that Linkey choked and punched him, which Smith considered to constitute assaults against Holly. (Aff. M.W., Ex. B at 88-89 & 100-101); [Docket 137, Ex. B. at 13, 16]. Smith acknowledges he was obligated to investigate Linkey's

assaults against Holly, but admits that he did not and that no one at MSOP asked him to do so.[11] (Aff. M.W., Ex. B at 89 & 101).

c.   <em>Holly's Transfer to AI</em>

During Smith's meeting with Holly on February 26, 2004, Konieska waited outside of the team room. (Holly Aff., ¶ 30). Afterwards, Konieska and Smith escorted Holly to the Northwest PI Unit and placed him in AI. (*Id.* at ¶¶ 30 & 32). At no time did an op-team meeting or a PI Assessment Team Meeting occur—either before or after Holly's placement in AI. (Aff. M.W., Ex. A at 140 & 143). Holly had never heard of AI before. (Holly Aff., ¶ 32).

d.   <em>The Remainder of Smith's Investigation</em>

Following Holly's placement in AI, Smith did nothing further to investigate Holly's horseplay with Linkey. Smith did not review Holly's medical files, which indicated that the incident was horseplay. (Aff. M.W., Ex. B at 58; Ex. G at DHS 1620). Smith did not interview eyewitnesses. (Aff. M.W., Ex. B at 60-62).

Smith believed there was insufficient evidence to support any charges against Holly for the altercation with Linkey. (*Id.* at 111-12). Neither Konieska nor anyone else informed Smith that Holly was a sexual psychopathic personality or was otherwise mentally ill, as required. (*Id.* at 15 & 59). Smith says that staff at MSOP told him they wanted Holly to go to jail. (*Id.* at 76-78).

After Holly was put in AI, Smith's investigation broadened to include threats Holly allegedly made against Kaufenberg during his suicidal episode on February 25-26, 2004. (Aff. M.W., Ex. B at 46-47 & 131-32; Ex. S at DHS 1474). On February 27, 2004, Smith obtained

---

[11]   Linkey was never placed in isolation for the incident. (Holly Aff., ¶ 31).

written witness statements regarding these alleged threats. (Aff. M.W., Ex. B at 64-65).

e.    *Smith's Report*

Smith waited until Holly was jailed on March 9, 2004, and then prepared a report on his investigation on March 10, 2004. (*Id.* at 45-46; Aff. M.W., Ex. T at DHS 1842-46). The report combined the investigations of Holly's horseplay with Linkey and the alleged terroristic threats against Kaufenberg. (Aff. M.W., Exs. B at 49 & T at DHS 1842-46). Smith included the Linkey altercation in the report even though he believed there was insufficient evidence to support any charges. (Aff. M.W., Exs. B at 111-12 & T at DHS 1844-45). Smith included information regarding Holly's shank in the report even though MSOP's policy is not to pursue contraband charges against a patient unless he possesses a firearm. (Aff. M.W., Ex. B at 180-81).

Smith's report did not mention that Holly was an SPP or mentally ill. (Aff. M.W., Ex. T at DHS 1842-46). Smith's report did not mention that Holly had an anger management problem for which he was receiving treatment at MSOP. (*Id.*). Smith's report did not mention that Holly was upset on February 25-26, 2004, because all of his property had been removed from his room without warning, including toilet paper and attorney-client communications related to pending charges. (*Id.*).

Smith's report later became the basis for criminal charges filed against Holly on April 30, 2004, by County Attorney Paul Shaffer. (Aff. M.W., Ex. U). Shaffer charged Holly with terroristic threats for allegedly threatening Tony Kaufenberg and contraband for the shank. (*Id.*). Shaffer filed no charges against Holly for his horseplay with Linkey. (*Id.*). That same day, Shaffer inexplicably charged Holly with a terroristic threats based on an incident in 2001. (Aff. M.W., Ex. V). Carlton County did not charge Holly for that incident when it charged Holly with similar crimes in September and November of 2002. (Holly Aff., ¶ 51).

**F.**   **Defendants' Unlawful Punishment of Holly**

1.   Isolation and Deprivations

Between February 26, 2004 through April 14, 2004, Defendants subjected Holly to isolation (characterized as AI) for 46 days and sent Holly to jail for 2 days. (*Id.* at ¶ 32). Konieska was the only staff member at MSOP who held herself out as responsible for Holly's placement in AI. (Aff. M.W., Ex. Pat DHS 1842 & 1844); [Docket No. 137, Ex. A at DHS 1607-08]. Konieska's reasons for placing Holly in AI were her conclusion that Holly violated his probation and her claim that he was under investigation by Smith. (Aff. M.W., Ex. A at 169); [Docket No. 137, Ex. A at DHS 1607].

On February 27, 2004, Konieska told Holly "you're not getting nothing to eat" and "you're going to prison." (Holly Aff., ¶ 32). For the first 8 days in isolation, Konieska denied Holly food, clean clothing, showers, and toilet paper. (*Id.*). For all 46 days in isolation, Holly was given no meaningful opportunity for exercise and was provided no treatment despite multiple requests. (*Id.* at ¶ 49; Aff. M.W., Ex. A at 192). Later, Konieska told Holly that she subjected him to these deprivations so that he would prefer prison over MSOP. (Holly Aff., ¶ 39). Konieska also told Holly that she was "sick and tired of you blacks" and that she was "going to make sure" that Holly went to prison. (*Id.* at ¶¶ 36 & 39).

Konieska never gave Holly any release criteria; instead, she told Holly that he would remain in AI "until the criminal charges pending against him were resolved." (*Id.* at ¶ 34); [Docket 132, ¶ 7]. From February 26, 2004 through April 1, 2004, Holly was let out of his PI Cell for 30 minutes per day, if at all—on many days, he was not let out at all. (Holly Aff., ¶ 13).

On April 1, 2004, Konieska exercised her authority over Holly's isolation and increased his commons breaks from a half-hour per day to two 2-hour long breaks per day. (Aff. M.W., Exs. A at 182-84 & Aff. M.W., Ex. P at DHS 1863 & 1869). Holly was still required to remain

in the PI Commons Area during these breaks, and he was still required to eat meals alone in his PI Cell. (Aff. M.W., Ex. P at DHS 1863). Konieska also outlined potential future "increases in freedom of movement" for which Holly was theoretically eligible—none of which included release from AI. (*Id.* at DHS 1864 & 1869).

### 2.   Defendants Send Holly to Jail for 2 Days

On February 27, 2004, Smith met with Dale Heaton, Chief of the MLPD. (Aff. M.W., Ex. B at 65). Smith also spoke with Mark McCarthy, Holly's probation officer, and he faxed the list of Holly's behavioral violations that Konieska prepared to him. (*Id.* at 149-50 & 153); [Docket 133, ¶ 17]. Both Smith and Konieska admit ongoing conversations with County Attorney Paul Shaffer. (Aff. M.W., Exs. A at 195-96 & B at 161-62). On March 9-11, 2004, Holly was inexplicably transferred to Carlton County Jail for 2 days. (Holly Aff., ¶ 40).

Holly remained in jail from March 9-11, 2004. (*Id.*). On March 11th, Holly had his first appearance before Judge Robert Macauley for an alleged probation violation; he was unrepresented at the hearing. (*Id.*). Judge Macauley appointed defense counsel and ordered that Holly be returned to MSOP. (*Id.*; Aff. M.W., Ex. W). When Holly returned to MSOP, Konieska immediately put him back in AI because she claims he was "awaiting transfer." (Aff. M.W., Ex. A at 166 & 169). No op-team, PI Assessment Meeting, or PI Review Panel Meeting occurred. (Holly Aff., ¶ 41).

### 3.   HRB Meetings

Holly was provided with no hearing until after he had been in AI for 8 full days. (Holly Aff., ¶ 37). On March 4, 2004, the PI Review Panel met with Konieska and discussed only the 31 hours that Holly spent in PI on February 24-25, 2004—not the justification for Holly's placement in AI. (Aff. M.W., Exs. A at 153 & G at DHS 1589). The documentation states that Holly was not invited to attend because he had recently threatened staff—MSOP's records show

that this statement was false and that Holly had been in behavioral control since he threatened to kill himself on February 29, 2004. (Aff. M.W., Ex. G at DHS 1589 & 1591-94).

On March 5, 2004, Holly attended an HRB Meeting. (Holly Aff., ¶ 37). MSOP staff discussed Holly's alleged assault on November 8, 2002 at this meeting instead of any recent justification for isolation. (Holly Aff., ¶ 37; Aff. M.W., Ex. N at DHS 115). The HRB recommended returning Holly to the living unit and ordered MSOP to provide Holly with food, clean clothing, showers, and toilet paper. (Holly Aff., ¶ 38; Aff. M.W., Ex. G at DHS 1588 & 1585). Afterwards, Holly was returned to AI, and he never received an explanation for rejection of the HRB's recommendation. (*Id.* at ¶¶ 38 & 40).

Holly also attended HRB Meetings on March 17 and 26, 2004. (*Id.* at ¶¶ 42-43). At both meetings, the HRB recommended that Holly be returned to the living unit. (*Id.*). MSOP rejected these recommendations, and Holly never received written explanations for the rejections. (*Id.* at ¶¶ 38 & 42-43). At one of the meetings, Konieska argued that County Attorney Paul Shaffer assured her by telephone that Holly would go to prison as justification for Holly's isolation. (Holly Aff., ¶ 44). The next day, Smith and Konieska went to Holly's PI Cell and said Holly would not be let out of AI until he went to prison. (*Id.*).

### 4.   MSOP's Failure to Preserve HRB Records

Even though HRB Meetings are tape recorded and are required to be documented in writing, MSOP did not produce any evidence regarding those meetings (written, tape recorded, or otherwise). (*Id.* at ¶ 45; Aff. M.W., ¶ 31). MSOP staff—including Konieska—were aware of this lawsuit in April of 2004, but took no actions to preserve this evidence. (Holly Aff., ¶ 48; Aff. M.W., Ex. A at 156 & 179-80; Aff. M.W., Ex. N at DHS 629-30; Aff. M.W. Ex. G at DHS 1541 & 1548).

5.      Holly's Probation Revocation and Conviction

On April 14-15, 2004, Holly had a probation revocation hearing and stood trial for the alleged assault on November 8, 2002. (Holly Aff., ¶ 47). Following revocation and conviction, Holly resided at Carlton County Jail until May 17, 2004, when he was transferred to DOC custody to serve his sentence. (Id.).

**G.      Disproportionality of Holly's Punishment**

Defendants' punishment of Holly from February through April of 2004 was grossly disproportionate to MSOP's regular disciplinary practices, including the discipline Holly received after assaulting another patient on January 26, 2004. (Holly Aff., ¶ 19). On that occasion, MSOP complied with all of the required procedures for PI and put Holly in PI. (Id.). On February 3, 2004, the HRB rejected a 35-day transition plan developed by MSOP staff for Holly's release from PI. (Id. ¶ 20; Aff. M.W., Ex. X at DHS 677). The HRB reasoned that 35 days in PI was "excessively restrictive" and recommended that Holly be released from PI on February 6, 2004—MSOP complied. (Holly Aff., ¶ 20; Aff. M.W., Ex. X at DHS 677).

Defendants' punishment of Holly was disproportionate to many instances of discipline imposed on white patients for engaging in similar behaviors. (Holly Aff., ¶¶ 52-57, 63; Clements Aff., ¶¶ 11-12; Scott Aff., ¶¶ 6-7; Caprice Aff., ¶¶ 11-13; Giishig Aff., ¶¶ 9 & 11-12). MSOP's records show frequent instances of conduct similar to Holly's behaviors, which resulted in significantly less harsh discipline than Defendants' treatment of Holly. (Aff. M.W., ¶¶ 27-30 & Exs. Z, AA, BB & CC).

**H.      MSOP's Ongoing Abuse of "Administrative Restriction"**

When Holly returned to MSOP after serving his sentence on February 2, 2009, he was quickly placed in PI. (Holly Aff., ¶ 59). On February 24, 2009, Holly was transferred back to DOC's custody. (Id.).

On June 2, 2009, Holly again returned to MSOP. (*Id.* at ¶ 60). On June 20, 2009, Holly was placed in PI. (*Id.*). On June 22, 2009, MSOP informed Holly that he was on AR because he was "under investigation" for an alleged threat—no hearing was provided. (*Id.* at ¶ 61). To this day, Holly remains confined in a PI Cell on AR for 23 hours per day. (*Id.*). MSOP has not provided any release criteria to Holly, and—even though Holly has been informed that the "investigation" of him is complete—he has not been charged with any crimes. (*Id.* at ¶¶ 61 & 65). MSOP has conducted no hearings regarding Holly's isolation in AR. (*Id.* at 66).

AR at MSOP is currently administered by the Office of Special Investigations, the department which Defendant Smith founded. (*Id.* at ¶ 67; Affidavit of Hayden Richards (hereinafter "Richards Aff."), ¶ 9; Giishig Aff., ¶ 13). Other patients report experiences in AR similar to Holly's—*i.e.*, they are locked in isolation without a hearing and without release criteria for months at a time and are periodically subjected to unjustifiable deprivations. (Scott Aff., ¶¶ 5 & 8-9; Clements Aff., ¶ 9; Richards Aff., ¶¶ 2-8 & 10; Caprice Aff., ¶¶ 2-6; Giishig Aff., ¶¶ 2-8). The ongoing abuse of isolation at MSOP is a serious problem for Holly and many other patients who are committed to MSOP. (Holly Aff., ¶ 73; Aff. M.W., Ex. B at 188-89).

## III.   ARGUMENT

### A.   Summary Judgment Standard

On a summary judgment motion, the Court must view the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). Only if there is no genuine issue as to any material fact is the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Credibility... is not an issue to be determined by summary judgment." *Hawkins v. Poole*, 779 F.2d 1267, 1269 (7th Cir. 1985).

### B.   Defendants' Arguments Are Misguided

The Defendants' Brief reflects an unduly narrow conception of this lawsuit. First,

Defendants argue that the Court dismissed some of Holly's claims, ignoring the fact that this Court allowed Holly to amend his complaint following appointment of counsel. *See* [Docket No. 131 at 1; Docket No. 71]. Defendants never objected to the Court's order on Holly's Motion to Amend or moved to dismiss any claims in Holly's Second Amended Complaint. Defendants argument appears to be that some of Holly's claims (which are unidentified) were dismissed prior to amendment of Holly's Complaint—*i.e.*, before the claims were asserted. This argument is unprecedented, absurd, and should be rejected. *See* [Docket No. 122 at 10-12].

Second, Defendants identify five allegations in the Complaint and claim that summary judgment is warranted because Defendants deny those allegations. [Docket No. 131 at 7-8]. This argument must be rejected because it asks the court to ignore the Defendants' testimony and other evidence, which supports Plaintiff's claims, in addition to making an impermissible credibility determination. Precisely because these five issues are controverted, summary judgment is inappropriate.

Third, Defendants ignore the procedural due process claim asserted in the Second Amended Complaint (Count VII). Thus, Defendants' brief is insufficient to warrant summary judgment even if unopposed. In addition, substantial evidence supports Holly's claims. Defendant's Motion for Summary Judgment must be denied.

## C.   **Defendants' Liability**

Defendants' liability can be established by showing any of the following: (1) they participated directly in a constitutional violation; (2) after being informed of the violation through a report or appeal, they failed to remedy the wrong; (3) they created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue;; or (4) they exhibited deliberate indifference to others' rights by failing to act on information indicating that unconstitutional acts were occurring. *Brooks v. Chappius*, 450 F.Supp.2d 220,

225 (W.D.N.Y. 2006).

Following orders "is not a defense." *Putman v. Gerloff*, 639 F.2d 415, 422 (8th Cir. 1981). If Defendants "knew or should have known that their actions" were unconstitutional, they may not "hide behind... institutional loyalty." *Id.* at 423. State officials may not "ignore the duty imposed by [their] office and fail to stop other officers who summarily punish a third person in [their] presence or... knowledge." *Id.* at 423. The relevant question is "did [Defendants] have knowledge of the fact that [Plaintiff's] conditions of confinement were punitive and yet refused to remedy such." *Villaneuva v. George*, 659 F.2d 851, 854 (8th Cir. 1981).

### D.  **Defendants' Violated Holly's Substantive Due Process Rights**

#### 1.  The *Youngberg* and *Bell* Standards

Courts analyze claims of a civilly committed patient's substantive due process rights under two different standards: (1) the standard of *Youngberg v. Romeo*, 457 U.S. 307 (1982); and (2) the standard of *Bell v. Wolfish*, 441 U.S. 520 (1979). *Green v. Baron*, 879 F.2d 305, 309–10 (8th Cir. 1989). Case law regarding 8th Amendment violations is relevant in assessing *Youngberg* and *Bell* claims because the due process rights of unconvicted persons are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983); *Youngberg*, 457 U.S. at 321–22.

Under *Youngberg*, liability results when an official's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323. Under *Bell*, liability results when an official acts with the intent to punish or when the official's actions constitute punishment—either because the actions are not rationally related to a legitimate governmental purpose or because they are excessive in relation to that purpose. *Bell*, 441 U.S. at 539; *Putman*, 639 F.2d at 419 ("[I]f a restriction or condition is not reasonably

related to a legitimate goal" or is "arbitrary or purposeless a court permissibly may infer that the purpose of the governmental action is punishment…"); *Finney v. Arkansas Bd. of Corrections*, 505 F.2d 194, 208 (8th Cir. 1974) (characterizing restrictions that are not "seriously defended as essential to security" as "unnecessary infliction of pain.").

2.    Defendants Unlawfully Punished Holly By Subjecting Him to 46 Days in
      Isolation Without Justification

Civilly committed patients and pre-trial detainees may only be subject to isolation for non-punitive purposes, such as security or to ensure their presence at trial. *Bell*, 441 U.S. at 539; *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003). There is a genuine issue of fact as to whether the Defendants acted arbitrarily and failed to exercise professional judgment by subjecting Holly to 46 days of isolation.

Isolation "is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1979); *see also Sandin v. Conner*, 515 U.S. 472, 485 (1995) (holding 30 days in isolation was "concededly punitive"); *Wolff v. McDonnell*, 418 U.S. 539, 572 n. 19 (1974) (holding that solitary confinement "represents a major change in the conditions of confinement" for convicted prisoners); *Finney*, 505 F.2d at 206 (characterizing solitary confinement as "mental punishment"); *Bono v. Saxbe*, 450 F.Supp. 934, 940 (E.D. Ill. 1978) (stating that the impact of conditions similar to AI on "prisoners' mental and physical health can be harmful, debilitating, and dehumanizing."); *Hardwick v. Ault*, 447 F.Supp. 116, 125 (M.D. Ga. 1978) ("Long periods of lock up in a confined space, limited contact with others, continued and unexpected surveillance and limited exercise eventually take a serious toll on the mental health of inmates.").

In *West*, the 7th Circuit held that summary judgment was inappropriate on a *Youngberg* claim when the evidence showed that the Wisconsin Resource Center held civilly committed sex

-24-

offenders in isolation for periods exceeding what could be justified by non-punitive considerations of security or treatment. 333 F.3d at 748. Here, Konieska admits that Holly's placement in AI on February 26, 2004 was not based on any security threat; rather, Konieska claims that Holly was put in isolation because he violated his probation and was "under investigation." After Holly returned from jail on March 11, 2004, Konieska claims she held Holly in isolation until April 14, 2004 because he was "awaiting transfer." These rationales are constitutionally insufficient to justify 46 days in the harsh conditions of isolation at MSOP.

> a. *Defendants' Determination that Holly Violated His Probation Did Not Justify Isolation*

Neither Defendants nor anyone else at MSOP had the authority to revoke Holly's probation. It is undisputed that the constitutionally required procedures for revocation of Holly's probation were not completed until April 14, 2004. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (establishing minimum due process for revocation of probation). Additionally, revocation traditionally subjects the probationer to punishment—the sentence for the underlying conviction—therefore, it cannot serve as a non-punitive rationale for the Defendants' actions. *Bell*, 441 U.S. at 539, n.20 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives.") (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)).

> b. *Smith's Investigation of Holly Did Not Justify Isolation*

Investigative status alone, absent security concerns, is insufficient to justify isolation. *Hughes v. Rowe*, 449 U.S. 5, 11–12 & n.12 (1980). Even if it was sufficient, Smith's investigation of Holly, which was complete within 36 hours, cannot justify 46 days of isolation. Notably, Smith intentionally delayed completing the report on his investigation of Holly until March 10, 2004—after Holly had been transferred to jail. This delay was in bad faith and intended to give the appearance that Holly remained "under investigation," which purportedly

justified Holly's isolation despite the absence of an investigatory activities.

c.      *"Awaiting Transfer" Did Not Justify Isolation*

After Holly returned from jail on March 11, 2004, he was immediately returned to isolation. Holly had not been convicted of any offense and his probation had not been revoked. Konieska's foregone conclusion that Holly was "awaiting transfer" was arbitrary and a failure to exercise professional judgment. *Higgs v. Carver*, 286 F.3d 437, 438–39 (7th Cir. 2002); (lack of sufficient explanation for pre-trial detainee's confinement in segregation for 34 days precludes summary judgment); *Hawkins*, 779 F.2d at 1270 (lack of sufficient explanation for pretrial detainee's confinement in segregation cell for 4 days raised triable issue as to whether officers intentionally inflicted punishment in bad faith).

d.      *Holly's Isolation Was Not Based On Security Concerns*

The evidence shows that Holly was not a security threat on the morning of February 26, 2004, when Defendants sent him to isolation. That morning, Holly wrote grievances, which rationally explained and identified mitigating circumstances for his anger and suicidal threats the night before. Holly signed a no-harm contract at 8:30 a.m. Holly then met with Smith after voluntarily giving him the shank he created the night before—while Holly was locked in his room and under constant staff observation.

Smith testified that Holly was calm and that he did not feel threatened by Holly during the meeting. Holly acknowledged his anger management problem during the meeting, and specifically requested to complete an anger log for his behavior the night before. Holly assured Smith that he did not intend to harm anyone. These facts do not portray Holly as an imminent threat to himself or others, as required to justify non-punitive isolation.

Nevertheless, at the end of the meeting with Smith, the Defendants escorted Holly directly to isolation. The Defendants failed to exercise professional judgment because they did

-26-

not attempt to assess Holly's behavior, mental state, or security risk, and they did not consider less restrictive alternatives, as was mandated by MSOP's policies and procedures. *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 850 (6th Cir. 2002) ("[W]here hospital staff admittedly fail to follow institutional policies and procedures, questions about the State's adherence to accepted standards of professional conduct are warranted."); *Villaneuva*, 659 F.2d at 854 (citing defendants failure to ensure institutional regulations were followed as evidence supporting liability on a *Bell* claim); *Hardwick*, 447 F.Supp. at 127 (M.D. Ga. 1978) (citing prison officials failure to make any attempt to determine whether prisoners were dangerous in support of holding isolation to be cruel and unusual punishment). Defendants failed to consider whether Holly's behaviors were related to a psychiatric condition, as required by MSOP's policies, and they did not obtain the approval of a doctor, as required under the Patient's Bill of Rights. *See Hoss v. Cuyler*, 452 F.Supp. 256, 299 (E.D. Pa. 1978) (holding that failure to obtain sufficient information on a prisoner's psychological condition to make an informed decision violates due process). Konieska failed to inform Smith of Holly's mental illnesses, and she never provided any treatment to Holly to help him return to the living unit, as required by MSOP's policies. Defendants' admitted failures to comply with procedures mandated by Minnesota law and MSOP's policies require denial of their Motion for Summary Judgment.

Even if Holly's isolation had been based on security concerns, the Defendants kept him in isolation far longer than could possibly be justified. Deprivations of liberty for administrative reasons are permissible only if the underlying justifications "continue to subsist during the period of segregation." *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975); *Hoss*, 452 F.Supp. at 290; Minn. Stat. § 253B.03, Subd. 1a(a) (prohibiting "any further deprivation of privileges than is necessary"). Excessive isolation may even violate the Eighth Amendment. *Hoss*, 452 F.Supp. at

285 n. 12.

Here, Holly's isolation for 46 days was wholly disproportionate to his alleged offenses. Just a month prior to Defendants' placement of Holly in isolation, the HRB rejected a proposal for 35 days of isolation after Holly assaulted another patient as "excessively restrictive." Instead, the HRB recommended that Holly be kept in isolation for a total of 11 days (January 26, 2004 through February 6, 2004) following that assault. Nothing Holly allegedly did in the days preceding his isolation approached the severity of the January assault, yet Defendants held Holly in isolation for 46 days anyway. Moreover, Defendants continued to hold Holly in isolation against the recommendations of the HRB, and never explained their rationale for doing so, as was required by MSOP's policies.

e.     *Holly's Isolation for 46 Days Was Arbitrary*

The evidence shows that Defendants' actions against Holly were arbitrary. The fact that Holly was singled out for investigation for his horseplay with Linkey while Linkey was not investigated for punching or choking Holly supports this conclusion. The fact that Holly had already been disciplined for the horseplay supports this conclusion. Importantly, Smith was asked to investigate Holly, and Konieska prepared the list of Holly's behavioral violations to send to Holly's probation officer, on February 25, 2004—*before* Holly threatened suicide and created a shank on the evening of February 25-26, 2004. [Docket 132, ¶ 9; Docket 133, ¶ 6]. Additionally, patient threats, horseplay, and contraband offenses are all common behaviors at MSOP, which usually result in far less restrictive discipline than 46 days in isolation. *See* Aff. M.W., ¶¶ 27-30 & Exs. Z, AA, BB & CC.

f.     *Holly's Isolation for 46 Days Was Not Justified*

In sum, Defendants' asserted reasons for subjecting Holly to 46 days of isolation are constitutionally insufficient. The evidence shows that Defendants' did not even attempt to assess

Holly's behaviors or mental state and disregarded Minnesota law and MSOP's policies. Defendants failed to provide Holly any release criteria or treatment, and they subjected Holly to punishment that was severely disproportionate to his alleged offenses. Viewed in the light most favorable to Plaintiff, there is a genuine issue of fact as to whether Defendants' isolation of Holly for 46 days was justified.

3. <u>Konieska Unlawfully Punished Holly By Depriving Him of the Basic Necessities of Life</u>

a. *Denial of Exercise for 46 Days*

Even convicted inmates must be provided "a meaningful opportunity for exercise." *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980); *Miller v. Carson*, 563 F.2d 741, 749–50 (5th Cir. 1977) ("[C]onvicted inmates must be 'allowed reasonable recreational facilities.'"); *Ruiz v. Estelle*, 679 F.2d 1115, 1152 (5th Cir. 1982) ("[C]onfinement of inmates for long periods of time without opportunity for regular physical exercise constitutes cruel and unusual punishment."); *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983) ("[A] total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees."); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) ("[R]egular outdoor exercise is extremely important to the psychological and physical well being of the inmates"); *Sinclair v. Henderson*, 331 F.Supp. 1123, 1131 (E.D. La. 1971) (holding that denial of exercise constitutes cruel and unusual punishment).

During all 46 days of his isolation in 2004, Konieska never offered Holly a meaningful opportunity for exercise. As his BA, Konieska was responsible for determining what restrictions were imposed on Holly in isolation, and she determined the length of his breaks from his PI Cell. (*See* Aff. M.W., Ex. P at DHS 1863 & 1869). From February 26, 2004 through April 1, 2004, Holly was let out of his PI Cell for 30 minutes a day, if at all. During these breaks, Holly was

required to stay in the PI Commons Area.    After attending to his hygiene needs, there was virtually no time for exercise.    From April 1-14, 2004, Konieska increased Holly's breaks to 4 hours per day, but he was still required to remain alone in the PI Commons Area during breaks.

In *Campbell*, the court held that inmates confined to their cells in excess of 16 hours a day must be given "at least one hour per day outside the cell."    623 F.2d at 507.    By limiting Holly's opportunity for exercise to walking in circles in the PI Commons Room—often for less than 30 minutes a day, if at all—Konieska violated Holly's substantive due process rights and exhibited a "callous indifference" to his well being.    *Ruiz*, 679 F.2d at 1152, n. 173; *Campbell*, 623 F.2d at 507 ("Merely allowing the inmates to walk around the narrow corridor between cells does not provide adequate exercise."); *Hardwick*, 447 F.Supp. at 127 (citing limited exercise provided to prisoners while in isolation in support of finding of cruel and unusual punishment); *Miller*, 563 F.2d at 750 (holding that pre-trial detainees are entitled to a "right of regular access to the outdoors," and that denial of outdoor recreation constitutes punishment.).

      b.    *Denial of Food, Clean Clothing, Toilet Paper, and Showers for 8 Days*

For the first 8 days he was in isolation, Konieska denied food, clean clothing, toilet paper, and showers to Holly.    It is unlawful to "withhold from prisoners the basic necessities of life, which include reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention." *Campell*, 623 F.2d at 508 (citing *Ahrens v. Thomas*, 570 F.2d 286, 289 (8th Cir. 1978)); *see also Green*, 879 F.2d at 309 ("governmental authorities cannot deny basic human necessities to persons in custody.").    Such deprivations assume "an added importance... in... solitary confinement." *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir. 1981).

There is no legitimate government objective that would justify the denial of food. *Hamm v. DeKalb County*, 774 F.2d 1567, 1573 (11th Cir. 1985); *Cooper v. Sheriff, Lubbock County,*

*Texas*, 929 F.2d 1078, 1083 (5th Cir. 1991); *Dearman v. Woodson*, 429 F.2d 1288, 1289–90 (10th Cir. 1970). Denial of food for only 32 hours constitutes cruel and unusual punishment. *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998).

Similarly, no legitimate government objective justifies denying clean clothing or appropriate sanitation or hygiene to a detainee. *Green*, 879 F.2d at 309 (governmental authorities cannot deny the basic human necessities of "sanitation" and "clothing" to persons in custody); *Maxwell*, 668 F.2d at 365 ("[C]lothing is a 'basic necessity of human existence' which cannot be deprived in the same manner as a privilege an inmate may enjoy."); *Finney*, 505 F.2d at 207–08 ("[P]risoners placed in solitary confinement" should not be deprived of "basic necessities including … clothing…").

Konieska's stated intent was to make Holly's isolation at MSOP so unbearable that he would want to go to prison—this is indefensible. In addition to violating Holly's substantive due process rights, Konieska's actions support Holly's claims for intentional and negligent infliction of emotional distress. Konieska's actions were extreme, outrageous, and substantially certain to cause Holly emotional distress. *Shqeirat v. U.S. Airways Group, Inc.*, 515 F.Supp.2d 984, 1002–03 (D. Minn. 2007); *see also Hanke v. Global Van Lines, Inc.*, 533 F.2d 396, 400 (8th Cir. 1976).

4.    Defendants Unlawfully Punished Holly By Sending Him to Jail for 2 Days

Jail is punishment. [Docket No. 48 at 10]; *Hutto*, 437 U.S. at 685;. A pretrial detainee may only be detained "to ensure his presence at trial." *Bell*, 441 U.S. at 536-37. Minnesota's Rules of Criminal Procedure specify that, upon a finding of probable cause for a probation violation, a "court shall issue a summons instead of a warrant whenever… a warrant is unnecessary to secure the appearance of the probationer, unless… the arrest of the defendant is necessary to prevent harm to the defendant or another." Minn. R. Crim. P. 27.04(1).

Jailing Holly for 2 days was unnecessary to ensure his presence at his March 11, 2004

hearing because Holly was already at a secure facility—MSOP. Holly's arrest was unnecessary to prevent harm to himself or others because Holly was already in isolation at MSOP. Nonetheless, Holly was inexplicably jailed on March 9-11, 2004, shortly after Smith lobbied Holly's probation officer and the MLPD police chief to take action against Holly, using Konieska's list of Holly's behavioral violations dating back to 1993. The fact that, a month later, Holly was transferred to court on the same day as his April 14, 2004 trial shows that the pre-hearing imprisonment of Holly for 2 days was unnecessary.

It is important to note that MSOP staff previously succeeded in jailing Holly for significant periods of time without a trial. Holly spent 13 days in jail in September 2002 without a trial, and after the alleged assault on November 8, 2002, Holly spent 131 days in jail without a trial. Defendants' actions were a continuation of MSOP's unlawful practices.

On March 11, 2004, Judge Macauley held that pre-trial detention of Holly was unwarranted after 2 days. These 2 days in jail were unnecessary, punitive, and a serious violation of Holly's substantive due process rights. Even if Defendants did not cause this imprisonment to occur—which they did—they remain liable because they were aware of Holly's imprisonment, yet did not intervene. *Putman*, 639 F.2d at 422; *Villaneuva*, 659 F.2d at 854.

E.      **Konieska Violated Holly's Procedural Due Process Rights**

Due process requires notice and a hearing before placement in solitary confinement. *Wolff*, 418 U.S. at 564-65 & 572 n. 19. "Segregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions." *Hughes*, 449 U.S. at 11. Even in emergency circumstances which necessitate foregoing a hearing, a prisoner must be given a hearing shortly after the transfer. *Hardwick*, 447 F.Supp. at 123; *Wright v. Enomoto*, 462 F.Supp. 397, 405 (N.D. Cal. 1976) ("In the event of a continuing emergency... said notice and hearing must be provided as soon as is

practical."), *aff'd*, 434 U.S. 1052 (1978).

### 1.    Holly's Isolation Was A Significant and Atypical Deprivation

Isolation in a PI Cell is a significant and atypical deprivation compared with the living

unit at MSOP.  On the living unit, patients are afforded numerous recreational activities,

treatment, and extensive opportunities for social interaction. *See supra* § II(B)(1).  In isolation,

patients are deprived of almost all environmental stimuli and social interaction, and they are

never allowed outside.  Instead, patients remain locked in concrete rooms.  If allowed out for a

commons break, they must remain in the PI Commons Room.  In *Sandin*, the Court held that

similar conditions were "concededly punitive." 515 U.S. at 485.  In *Wilkinson v. Austin*, the

Court held that convicted inmates had a liberty interest in avoiding conditions near-identical to

isolation at MSOP "under any plausible baseline." 545 U.S. 209, 214-15 & 223 (2005).

Because of the extreme, dehumanizing nature of isolation at MSOP, Minnesota law

provides safeguards against abuse.  Minn. R. § 9515.3090, Subps. 4-5.  MSOP's policies offer

further procedural protections.  Konieska's position is that these procedural safeguards were not

applicable because she used the adjective "administrative" instead of "protective." *See* [Docket

132 at ¶ 10 ("Holly did not stay in [PI].")].

### 2.    Konieska Did Not Comply With State Laws Regarding PI and AR

Due process requires adherence to state laws with mandatory language. *Morgan v.

Rabun*, 128 F.3d 694, 699 (8th Cir. 1997) (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983) and

distinguishing *Sandin*, 515 U.S. at 481-82 (1995)); *Nicoletti v. Brown*, 740 F.Supp. 1268, 1287

(N.D. Ohio 1987); *see also Wilkinson*, 545 U.S. at 221.  Minnesota law mandates that PI only be

used "as a way of defusing or containing dangerous behavior that is uncontrollable by any other

means." Minn. R. § 9515.3090, Subp. 4.[12]   Minnesota law requires that specific procedures be

followed if PI will extend beyond 48 hours, including a review by persons not involved in the

decision to impose PI. Minn. R. § 9515.3090, Subp. 4-5.

Konieska's effort to distinguish AI from PI for the purpose of avoiding the requirements

of Minnesota law is untenable.   In *Sandin*, the Court held that it was "the nature of the

deprivation," not "the language of a particular regulation," that determined what process was

due.    515 U.S. at 481-82.    Here, Konieska elevates the significance of the adjective

"administrative" to one of constitutional import, reasoning that it justifies abandoning the laws

applicable to PI, while ignoring the fact that—as Konieska admits—AI and PI consist of the

exact same deprivation. (Aff. M.W., Ex. A at 78). If, as *Sandin* holds, it is the deprivation that

determines what process is due, then laws regarding PI must apply when a patient is subjected to

PI, even if the adjective "administrative" is used.

Even if procedural safeguards for PI were not required for AI, Konieska violated

Minnesota law regarding AR. "A patient has the right to be free from unnecessary or excessive

[AR]," and may not be subject to "any further deprivation of privileges than is necessary."

Minn. Stat. § 253B.03, Subd. 1a(a). A patient on AR while under investigation must be released

when the investigation is completed, unless charged with a crime.  Minn. Stat. § 253B.03, Subd.

1a(e). In this case, Smith's investigation of Holly was complete on February 27, 2004, and Holly

was not charged with any crimes until April 30, 2004, yet Konieska unjustifiably subjected Holly

---

[12]     Unlike federal regulations, which are not binding law, Minnesota regulations are "as binding as a
statute" if reasonable. *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, *6 (D. Minn. 2007) (citing *State v. Hopf*, 323 N.W.2d 746, 752 (Minn. 1982)).

to isolation until April 14, 2004.  In doing so, Konieska violated Minn. Stat. § 253B.03 and Holly's procedural due process rights.

3.   <u>Konieska Did Not Provide Any Release Criteria to Holly</u>

Minnesota law and MSOP's policies require that patients be given criteria for release from PI.  Minn. R. § 9515.3090, Subp. 4(C)(7).  Objective guidelines for determining whether confinement in isolation is necessary are "an essential requirement of due process..." *Hoss*, 452 F.Supp. at 294-95 & 299 (E.D. Pa. 1978); *Bono*, 450 F.Supp. at 946–47 (holding that "the lack of any idea about what could be done to be released" from conditions similar to AI resulted in "unnecessary pain and suffering"); *Hardwick*, 447 F.Supp. at 123 (holding that isolation for an indefinite duration is "more unbearable to a prisoner than the harsh but definitely limited stay in solitary").

Konieska admits that Holly's isolation was indefinite.  Konieska told Holly he would remain in isolation until "the criminal charges pending against him were resolved." [Docket 132, ¶ 7].  The resolution of those unidentified charges could have taken months or years.  Indeed, during his isolation in 2004, Holly was awaiting trial for an incident that occurred in November of 2002.  Konieska's admitted failure to give Holly any criteria for release from isolation violated both Minnesota law and Holly's procedural due process rights.

4.   <u>Holly Never Received A Meaningful Hearing To Contest His Placement in AI</u>

At no point in 2004 was Holly provided with a "fair opportunity for rebuttal" regarding his isolation.  *Wilkinson*, 545 U.S. at 226.  Even if Holly engaged in the behaviors Defendants allege, that does not "deprive him of his right to relief from deprivations of constitutional dimension." *Wycoff v. Brewer*, 572 F.2d 1260, 1267 (8th Cir. 1978).  Here, Konieska admits that Holly was denied even the minimal procedures provided in the *Senty-Haugen v. Goodno* case for

-35-

the first 8 days he was in isolation. 462 F.3d 876, 888 (8th Cir. 2006) (noting that Senty-Haugen had "the opportunity to rebut the rationale at the review panel meeting" the day after his placement in isolation).

Holly attended 3 HRB meetings on March 5, 17, and 26—those hearings were a sham. At all three meetings, the HRB recommended that Holly be released from isolation. MSOP staff, including Konieska, unilaterally rejected the HRB's recommendations, without written explanation, as required by MSOP's policies. At one of the meetings, Konieska argued that Holly must stay in isolation because County Attorney Paul Shaffer personally assured her that Holly would be going to prison.

Konieska's pre-determination of Holly's guilt precluded any possibility that the HRB meetings could satisfy Holly's procedural rights, and the unexplained rejection of the HRB's recommendations is inexcusable. Under the *Matthews* balancing test, the HRB meetings were insufficient because: (1) Holly has a greater liberty interest in avoiding isolation than a convicted inmate under *Bell* and *Youngberg*; (2) a review board without authority invites erroneous placement and abuse; and (3) MSOP has no legitimate interest in violating Minnesota law or avoiding procedures routinely applied for PI. *Wilkinson,*, 545 U.S. at 224-27 (citing *Matthews v. Eldridge*, 424 U.S. 319 (1976)).

Furthermore, because MSOP and Defendants unjustifiably failed to preserve any records regarding the HRB Meetings, Holly is entitled to an adverse inference that the withheld evidence is harmful to Defendants. MSOP's policies require documentation of the HRB's recommendations and any rejections or modifications of same. Because Konieska and others at MSOP were aware that litigation by Holly was pending in April of 2004, a duty to preserve this evidence arose. *Kounelis v. Sherrer*, 529 F.Supp.2d 503, 518 (D. N.J. 2008). The evidence is

highly relevant, and the harm of its loss was foreseeable because it relates to the only meetings at which discussion of Holly's isolation occurred. Without an adverse inference, Holly will suffer irreparable prejudice—*i.e.*, the evidence at trial will be the "word of a convicted felon" against the testimony of Defendants. *Id.* at 521.

### F.     Defendants Conspired Against Holly Because of His Race

The Defendants' statements show that they unlawfully punished Holly and deprived him of due process of law because of his race. The Defendants worked together, and each took numerous actions to punish Holly. Smith investigated Holly, secured Holly's imprisonment for 2 days (using Konieska's list of Holly's behavioral violations), and filed a report against Holly with the County Attorney in bad faith. Konieska used Smith's investigation as an excuse to subject Holly to excessive isolation and deprivations. Because Defendants' statements show these actions were motivated by racial animus, and because similar behaviors are routinely tolerated for white patients, there is a genuine issue of fact as to Holly's conspiracy claim. *Conklin v. Lovely*, 834 F.2d 543, 549–50 (6th Cir. 1987); *Eilers v. Coy*, 582 F.Supp. 1093, 1099-1100 (D. Minn. 1984). The intra-agency doctrine is inapplicable because Konieska and Smith were employees of different state agencies—DHS employed Konieska, and DOC employed Smith.

### G.     Defendants Are Not Entitled to Qualified Immunity

Defendants are not entitled to qualified immunity because they deprived Holly of "clearly established statutory and constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Bonner v. Outlaw*, 552 F.3d 673, 679-80 (8th Cir. 2009); [Docket No. 48 at 14-15]. That Defendants could not punish Holly or arbitrarily inflict punishment on Holly was clearly established well before 2004. *Bell*, 441 U.S. at 539; *Youngberg*, 457 U.S. at 323; *West*, 333 F.3d at 748; *Campbell*, 623 F.2d at 507-08. That

Defendants' were required to comply with Minn. R. § 9515.3090 and Minn. Stat. § 253B.03 was clearly established. *Morgan*, 128 F.3d at 699. That Holly was entitled to a hearing was clearly established. *Hughes*, 449 U.S. at 11; *Wycoff*, 572 F.2d at 1267. Defendants are not entitled to qualified immunity.

## IV.    <u>CONCLUSION</u>

"A society which takes pride in its commitment to the preservation of human rights must be ever vigilant to protect those rights." *Bono*, 450 F.Supp. at 947. The Court must never abdicate its "constitutional responsibility to delineate and protect fundamental liberties." *Campbell*, 623 F.2d at 505. The evidence shows that Defendants subjected Holly to almost 7 weeks of punishment in 2004 and that MSOP continues to employ these abusive practices today. Because the evidence supports Holly's allegations, Defendants' Motion for Summary Judgment must be denied.

Dated: September 16, 2009

**BRIGGS AND MORGAN, P.A.**

By: 

Margaret K. Savage (#96003)
Michael C. Wilhelm (#387655)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFF ELLIOTT HOLLY**

## ACKNOWLEDGMENT

The undersigned acknowledges that sanctions may be imposed pursuant to Minn. Stat. §

549.211, subd. 3.

_____
Michael C. Wilhelm